## PISCREK v. VICTOR AMERICAN FUEL CO.

(Circuit Court of Appeals, Eighth Circuit.   December 17, 1919.)

### No. 5319.

MASTER AND SERVANT ⊚⟞185(12)—MINE OPERATOR NOT LIABLE FOR INJURY TO EMPLOYÉ BY COEMPLOYÉ'S ACT OUTSIDE SCOPE OF EMPLOYMENT.

A mining company *held* not chargeable with negligence which rendered it liable for injury to a miner, caused by a car running down a tunnel without control at such speed that it jumped the track, where employés under instructions had loaded the car and left it standing on a level place with the wheels blocked, from which place it was started by another employé, having no duty in respect to it and without instructions, and through his mistake was sent down the wrong track.

In Error to the District Court of the United States for the District of New Mexico;  Colin Neblett, Judge.

Action at law by Joseph Ivan Piscrek against the Victor American Fuel Company.   Judgment for defendant, and plaintiff brings error. Affirmed.

E. W. Dobson, of Albuquerque, N. M. (A. T. Hannett, of Gallup, N. M., on the brief), for plaintiff in error.

Kenaz Huffman, of Denver, Colo. (Caldwell Yeaman and Frank E. Gove, both of Denver, Colo., on the brief), for defendant in error.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

STONE, Circuit Judge.   Error from judgment in personal injury suit entered on a directed verdict at the close of plaintiff's case.   The bases of the action of the court in directing the verdict were that there was no proof of negligence on the part of defendant, and that the proximate cause of the alleged injury was the act of a fellow servant. Counsel for plaintiff here contend that there was substantial evidence of negligence by defendant, and that the person causing the injury was not a fellow servant.

The allegations of negligence in the petition are that the defendant—

"negligently permitted a car loaded with débris, tram car wheels, axles, and other heavy material to descend said tramway  *  *  *  under no control whatsoever and at such a high rate of speed that said car ran off said tramway  *  *  *  by reason of its high velocity and momentum acquired by said tram car loaded as aforesaid and running without control down said slope, tunnel or passageway for a distance of from four hundred to five hundred feet."

And again:

"That said loaded tram car was negligently permitted to descend said main slope, tunnel, or passageway upon said tramway or tram road at such speed and velocity and beyond any control and unattended by the defendant or any servant or employé of said defendant."

The statement by counsel for plaintiff in their brief of the evidence, upon which they rely to show negligence of defendant and absence of fellow service is, omitting medical testimony, as follows:

"Plaintiff had worked in mines for a number of years, at Gallup and elsewhere; he worked in different parts of the Weaver mine.

"On August 8, 1914, was working in face of main slope of tunnel in Weaver mine; had a partner working with him. About 10:30 a. m. plaintiff and his partner ate their lunch, sitting on a tool box which was about 40 feet from the face of the tunnel where they worked. When about through with their lunch they heard some one cry out, 'Look out,' or some sort of warning. Plaintiff immediately got up and started up the tunnel to where there was a side entry, and his partner followed. The side entry was about 40 feet up the tunnel from where the tool box was located where they were eating their lunch. They had gone about 10 feet when the car coming down the slope jumped the track and contents of same were thrown on plaintiff, causing the injury.

"Plaintiff was employed by defendant as a 'coal digger' and was to receive 63 cents per ton for coal, and $2 per yard for coal and $2 per yard for rock for driving the entry. The defendant was to haul out the loaded cars and furnish empties; also furnish plaintiff with material for props and material for timbering the slope; also rails for extending the track; and plaintiff was to lay the rails. The coal was hauled out and weighed and paid for at the rate of 63 cents per ton and the slope or tunnel was measured and paid for at the rate of $4 per yard for coal and rock.

"After the accident the plaintiff was removed to a hospital and attended by the company's doctor.

"Andy Kuchak: He was the partner of the plaintiff, and they worked together and were working together in digging coal and extending the slope or tunnel in the Weaver mine on the day the accident happened. His testimony corroborates that of plaintiff as to the material facts as to when, where and how the injury occurred.

"Otto Fellin: Otto Fellin was pit boss in charge of the operation of the mine underground. On the morning of the 8th of August, 1914, he directed a coal car to be taken up the main slope and located at a point where a coal car had been wrecked and to load up the débris. He directed Tony Kouglovic and Louy Buyan, two company men, to load the car with the wreckage, which consisted of car wheels, axles, and other parts of wrecked cars. The car was taken up to the place where it was to be loaded by the mule driver.

"Tony Kouglovic: He was what is known as a company man working for so much per day, and was under the direction of the pit boss, who could direct him to do any kind of work necessary, including digging coal when not otherwise engaged in other work. On the morning of the 8th of August, 1914, the pit boss instructed him to go up the main slope and to load a car with the wreckage of a coal car. This he proceeded to do, rather early in the morning, about 8 o'clock, and was assisted in performing the labor by one Louy Buyan. After they had loaded the car they proceeded to let it down the slope a distance of 200 or 250 feet. The car had in it three sprags, and when they reached a place in the slope or tunnel that was reasonably level, they put the fourth sprag in and left the car standing about 15 feet above the hoist where the engine was operated, and proceeded down the slope to the fourth west entry, and one of them went down the slope some 300 feet, to where the mule driver was to notify him that they had loaded the car, and where they had left it, and the other party went into one of the rooms for the purpose of digging coal.

"Louy Buyan: His testimony was practically the same as that of Kouglovic. The pit boss told him to help load the car, which he did. Both he and Kouglovic testified that the reason they did not let the car down to the fourth west entry, but left it standing on the track in the main slope or tunnel, was because from the point where they left it standing, down to the fourth west entry, the grade was so steep that they were afraid to attempt to lower the car down, even with four sprags, for fear it would get away from them. Tony and Louy were not termed 'coal diggers,' but were employed by the company at so much per day to do any and all kinds of work as they might be directed.

"Roger Boissier: Boissier testified that at the time that his deposition was taken in May, 1916, that he would be 17 years old June, 1917. That would make him about 14 years and 2 months old at the time that the accident oc-

curred. He had been running the engine a few days prior to August 8th, the date of the accident.

"Interrogatory 6: Was it any part of your duty to move a pit car which might be standing upon the track in any part of the mine, other than incident to the capacity in which you were employed? Answer: No.

"The witness stated he saw a pit car standing upon the track in the main slope on the 8th day of August, 1914, that the car was about 10 feet from the hoist, and that the car contained wheels, bumpers, and doors, and further testified as follows:

"Int. 25: How long had said pit car been standing on the track before you moved it, if you did move it? Answer: About 15 minutes.

"Int. 32: If you moved this pit car, why did you move it? Did you receive any instructions to do this? Did you have any authority whatsoever to do this? Answer: The rope rider told me to go open the door. I saw the car standing there; the trip was coming down, and I had to get the car out of the way. Nobody didn't tell me to do it.

"Int. 34: If you had not moved said car, how would it have been moved? And by whom? Answer: I don't know.

"Int. 35: What did you intend doing with said car? Answer: I was going to switch it onto the parting.

"Int. 36: How far down the slope from the car was there a switch? Answer: Nine feet.

"Int. 37: Was this switch set for a through trip down the slope, or was it set for a trip down an entry or parting? If it was set for a trip down an entry or parting, state what entry or parting. Answer: The switch was throwed for the parting. I thought I throwed it for the parting, and it went down the straight. I don't know.

"Int. 40: Do you know whose duty it was to turn such switch? If so, state whose duty it was. Answer: The rope rider.

"Int. 41: If said switch was turned for the entry or parting, what was the purpose or reason thereof, if you know? Answer: The switch was turned for the parting. I expected the car to go on the parting, and it went down the main slope.

"Int. 49: How far away from the point where the car was standing upon the track did the car leave the track? Answer: About 200 yards.

"On cross-examination the witness testified that he had been trapping for about five months before they put him to work running the engine.

"Cross-Int. 11: Who told you how to run an engine connected with a hoist? Answer: Nobody. Just one digger showed me how to do it.

"The witness testified that Mr. Summerville gave him an order, and the superintendent put him to work, and that after the accident happened he was changed back from running an engine to trapping, and the reason for changing him back, he stated, was because he hurt the man, and he only worked five days for the company thereafter, and he was fired.

"Cross-Int. 36: Who told you to go and open the door at the parting? Answer: The rope rider.

"Cross-Int. 37: What was his business? Answer: He was there to ride rope, that is all.

"Cross-Int. 38: Well, what did he do? What is a rope rider? Can you tell me? Answer: He just cut the rope off and put on the empties.

"Cross-Int. 46: Did the rope rider tell you to take that car down? Answer: No. Nobody told me.

"Cross-Int. 47: Well, why did you do it? Answer: I had to do it, because, if I did not do it, it would knock that car off the track, and there would have been a wreck.

"Cross-Int. 54: Now when you went down or up, whichever way you went, to open doors, what did you do when you opened the door? Answer: Well, I was going to open the door, and saw the car there, and had to drop that car down. I pulled the sprags out, and the car got loose and hit that man.

"Cross-Int. 78: Who gave you your instructions, when you were running that engine? Answer: They never told me nothing—just showed me how—that was all.

"Cross-Int. 79: Did anybody tell you about moving the cars, or anything like that? Answer: No. Told me nothing.

"Cross-Int. 94: And did anybody tell you how to take sprags out of a car? Answer: Nobody; no.

"Cross-Int. 108: And you thought it was your duty, then, when you got information, to go and open the trapdoors, and you saw the car there—you thought it was your duty to move it? Answer: Yes.

"Cross-Int. 109: Where were you going to sent it to? Answer: Fourth west.

"Cross-Int. 113: Should not the switch have been turned? Answer: I did not know so. It was turned for the straight, and I thought it was turned for the fourth west, and I was going to turn it for the straight, and the car went down straight on.

"Cross-Int. 123: And at the time you started to let it down, you did not turn the switch to the fourth west? Answer: Well, before I come to get the car, I had a little light, and the switch was throwed for the straight, and I thought it was throwed for the fourth west, and the car ran straight down.

"Cross-Int. 147: If you say it was not your duty to move this car, and you had no instructions, then why did you do it? What reason did you have? It was not your business to do it, was it? Answer: Nobody told me to do it, and I did it my own self.

"Cross-Int. 175: When the rope rider called to you that they were bringing the empties down, he called to you to do what? Answer: To open the doors.

"Cross-Int. 176: And that was when you took it upon yourself to get this car out? Answer: Yes.

"Cross-Int. 177: At the time, were you also running the engine? Answer: No; I was running the engine about that time, but was not running the engine at the time they hurt that man.

"Cross-Int. 178: You were employed to do both jobs, then, and you undertook to do the third job, by letting the car down, did you? Answer: Yes.

"Cross-Int. 179: You did it to protect the company, did you? Answer: I was trying to help the company out; yes.

"Cross-Int. 180: And you thought you were doing the right thing, but the car got away from you? Answer: Yes."

To this statement should be added certain testimony of the witness Roger Boissier, as follows:

"Interrogatory No. 26: Could the car be moved with the sprags all in the wheels, if there were sprags in all the wheels? Answer: No; it could not.

"Interrogatory No. 27: If you took any sprags out of the wheels of said car, how and when did you take them out? Answer: I took them out one by one; I took two out and two afterward.

"Interrogatory No. 28: Could you move the car with one sprag out? Answer: No; I tried to, and couldn't do it.

"Interrogatory No. 29: Could you move the car with two sprags out? Answer: No; I tried it, and couldn't do it.

"Interrogatory No. 38: Did you receive or have any instructions to turn said switch, if you did turn it? Answer: No.

"Interrogatory No. 39: Did you have any authority whatsoever to turn said switch? Answer: Nobody told me to turn the switch."

This evidence may be summarized as follows: A mine car had been loaded with débris and car wreckage and placed upon a comparatively level portion of the track, where it was securely held by four sprags (pieces of wood used in blocking the wheels), until it could be taken out of the mine. A short distance beyond where the car was so standing the track declined sharply, running to the end of the tunnel, where plaintiff worked. Between where the car stood and the tunnel end was a switch track, which ran into a different opening. After the car had remained in place for 15 minutes, the boy, Roger

Boissier, found it, and, thinking that it should not be allowed to remain there, changed the switch and released the car, with the intention of running it down the switch track. As a matter of fact the switch had been before set for the switch track, and he mistakenly changed it to the main track. The car was so securely fastened where it was that he could not move it until he had removed all four of the restraining sprags. The accident was thus caused solely by the boy, in mistakenly turning the switch already properly set to protect plaintiff from cars coming down the track, and by the boy removing the sprags and starting the car, which was safely secured. Neither of these acts was any part of his duty, and he had no duties touching the placing or moving of the car or switch.

The above facts, when viewed in the light most favorable to plaintiff, fail entirely to attach any responsibility to the defendant for what the boy did, whether such acts were or were not negligent. The boy stepped completely out of the scope of his employment, and acted entirely upon his own responsibility, without the consent or knowledge of the defendant. The fact that defendant may be responsible for the car being on the track where it was when the boy found it is immaterial, for it was left safely secured, and so remained until the boy removed the sprags and pushed it along the track to the incline. The fact that it was so left was no part of the proximate cause of the accident.

The conclusion that the evidence failed to show any negligence on the part of defendant makes it unnecessary to discuss the fellow servant question.

The judgment is affirmed.